**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Herbert Louis BURDEAU,**
**Defendant–Appellant.**

No. 97–30388.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1998.

Decided Feb. 9, 1999.

Daniel Donovan, Assistant Federal Defender, Great Falls, Montana, for the defendant-appellant.

Lori A. Harper, Assistant United States Attorney, Great Falls, Montana, for the plaintiff-appellee.

Before: BOOCHEVER, REINHARDT, and GRABER, Circuit Judges.

Opinion by Judge REINHARDT; Partial Concurrence and Partial Dissent by Judge GRABER.

REINHARDT, Circuit Judge:

Herbert Louis Burdeau, a Native American, was visibly intoxicated when he committed an armed robbery of a store located within the Blackfeet Indian Reservation and was apprehended for his crime. Probably realizing that the evidence would clearly establish that he had committed the act, Burdeau entered a conditional plea agreement that limited his sentence to a ten-year maximum. At the last minute, however, he changed his mind and withdrew the plea. By so doing, he preserved his opportunity to argue that he should be permitted to raise a legal defense that appeared to provide the only hope of avoiding conviction: that, because he was intoxicated, he could not have formed the intent required by the robbery statute. During subsequent pretrial proceedings, however, the district court rejected that argument and granted the state's motion to preclude the defense. Following that decision, which foreclosed the only realistic defense that Burdeau could offer, Burdeau sought to reinstate his guilty plea under the original plea agreement. The prosecutor objected, the court denied his request, and the prosecution commenced. After a two-day trial, Burdeau was convicted of robbery and use of a gun in the commission of a felony, and sentenced to 210 months in prison.

Burdeau's decision to withdraw his initial plea, a decision that was in all likelihood based on his counsel's failure to appreciate the type of intent required for a robbery conviction, will thus cost him seven and one-half additional years in prison. Because the district court did not commit legal error at any stage of these proceedings, we are without power to do anything other than affirm Burdeau's conviction. We note, however, that the seven and one-half year addition to Burdeau's sentence, which serves to almost double his time in prison, does not appear to be a fair or proportionate penalty for his effort to explore the question whether a particular defense was legally available. We therefore encourage the United States Attorney's office to consider utilizing its authority under Federal Rule of Criminal Procedure 48(a) to move to dismiss one of the counts of conviction so that the sentence Burdeau re-

ceives will be one that is consistent with the purposes and objectives of our sentencing statutes.

## BACKGROUND

This case arises out of an incident on September 4, 1996, when an obviously intoxicated Burdeau robbed a grocery store in St. Mary, Montana. Burdeau, a member of the Blackfeet tribe, entered the St. Mary's Park Cafe and Grocery and told one of the clerks that he wanted to buy some bullets. Upon being informed that the store did not carry bullets, he swore and slammed his hand on the glass countertop. He then approached the other clerk and repeated the request for bullets. Upon receiving the same answer, he requested cigarettes. The clerk asked him what kind he wanted. Burdeau replied by asking how much money was in the cash register. The clerk responded that this information was none of Burdeau's business; Burdeau then displayed a gun and told the clerk to give him the money. The clerk handed over approximately $700 to $800. Burdeau, making no apparent effort to hide his destination, walked next door to Kip's Beer Garden.

Once at Kip's, Burdeau asked a friend for a ride home. By this time, the clerks had reported the robbery, and a tribal police officer followed the car in which Burdeau rode to a nearby ranch located on the reservation. As he followed the car, the tribal officer observed its occupants throw a Budweiser box out the car window. After the car arrived at the ranch, the tribal police arrested Burdeau and a few other individuals, and searched the car and the nearby area. They discovered cash inside the car and in the Budweiser box, which was found along the private road that led to the ranch. The next day, the police also recovered a .38 caliber revolver along the private road and more cash under a rock next to the ranch.

The two store clerks both identified Burdeau from a photographic array. At trial, one clerk also identified the clothing that had been taken from Burdeau as the clothing that the robber had worn. Other witnesses linked Burdeau to the Budweiser box and to the gun discovered near the ranch. However, no identifiable fingerprints were found on the gun, and none of the identifiable fingerprints on the countertop matched Burdeau's.

Burdeau was indicted on two felony counts, robbery and use of a firearm during commission of a crime of violence. He filed a number of pretrial motions, including a motion to suppress the pretrial identification and a motion for an in-court lineup. The motions were all denied.

Trial was set for June 24, 1997. At a pretrial conference held on June 23, 1997, the parties discussed their disagreement as to whether robbery was a crime of specific or general intent. Only a defense of diminished capacity to a specific intent crime offered Burdeau any practical opportunity to avoid conviction. The court advised the parties to file an in limine motion before trial.

Instead of filing the motion, however, Burdeau entered into a conditional plea agreement which limited his sentence to a maximum of ten years in return for his guilty plea to the robbery count and dismissal of the gun count. The court accepted the plea. Then, on September 24, 1997, the judge held a sentencing hearing. He initially indicated that he was not inclined to abide by the limitation of the sentence to ten years and instructed Burdeau that he had the right to withdraw his plea. After further discussion of the matter with the United States Attorney, however, the court decided to accept the conditional plea's sentence recommendation. Although the judge was therefore no longer obligated to offer Burdeau the opportunity to withdraw his plea, he asked him whether he wanted to do so. Burdeau spoke with his attorney, family members, and others who were present at the hearing, and then stated that he did want to withdraw his plea. The court granted his request.

Burdeau then gave formal notice that he planned to offer a diminished capacity/intoxication defense. On October 27, the government filed a motion in limine objecting to the defense. The court granted that motion on October 31, ruling that the crime of robbery required only general intent and that the defense was therefore unavailable. Burdeau then made a motion to reinstate his guilty plea under the conditional plea agreement.

The prosecution objected and the court denied the motion. The case proceeded to trial on November 3.

After two days, the jury returned a verdict convicting Burdeau on both counts. The district judge sentenced him to 150 months for robbery and 60 months for use of a gun in the commission of a felony, the sentences to run consecutively, and three years of supervised release. This appeal followed.

## INTENT REQUIREMENT

■ Burdeau raises a number of challenges to his conviction. Primarily, in reliance on *United States v. Lilly*, 512 F.2d 1259 (9th Cir.1975), he argues that under federal law robbery is a crime of specific, rather than general, intent and that he therefore should have been allowed to raise a voluntary intoxication defense. A defense based on voluntary intoxication is available only for a specific intent crime. *See United States v. Oliver*, 60 F.3d 547, 551 (9th Cir.1995) (citing *United States v. Sneezer*, 983 F.2d 920, 922 (9th Cir.1992)).

■ The statute proscribing robbery in special maritime or territorial jurisdictions, including Indian reservations, 18 U.S.C. § 2111, defines the offense as follows: "Whoever ... by force and violence, or by intimidation, takes or attempts to take from the person or presence of another anything of value...." Prior to its amendment in 1948, § 2111 had required specific intent through inclusion of the word "feloniously." That term was deleted, however, by the 1948 amendment. In *Lilly*, this court held that robbery *as an element of felony murder* under the felony murder statute, 18 U.S.C. § 1111, required specific intent, not because of anything contained in § 2111 but because otherwise an individual could be convicted of first-degree murder without having the specific intent to commit *any* crime. *Id.* at 1261. We expressly confined our ruling in *Lilly* to the felony murder statute, and did *not* reach the question whether robbery as defined in the amended § 2111 required specific intent. Indeed, we warned, "it may be that specific intent is no longer required by § 2111.... That question we do not reach. We confine our ruling to robbery as the term is used in § 1111." *Id.* The fact that the *Lilly* dissent

misread our holding as applying also to § 2111 (*see Lilly*, 512 F.2d at 1264 (Real, J., dissenting)) does not change the fact that the holding was in fact a much narrower one.

■ While *Lilly* therefore does not resolve the question, two factors compel us to interpret § 2111 as requiring only general intent. First, "[w]hen a statute does not contain any reference to intent, general intent is ordinarily implied." *United States v. Martinez*, 49 F.3d 1398, 1401 (9th Cir.1995) (citations omitted). This presumption is strengthened by the fact that the term "feloniously," which implied a specific intent requirement, was specifically removed from the statutory language.

Second, the wording of § 2111 is nearly identical to the wording of 18 U.S.C. § 2113(a), which defines bank robbery: "Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, ... any property or money or any other thing of value belonging to ... any bank, credit union, or any savings and loan association...." We have held previously that bank robbery is a crime of general intent. *See United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir.1993); *United States v. Darby*, 857 F.2d 623, 626 (9th Cir.1988). There is no reason that the language in § 2111 should be read differently, and we therefore conclude that robbery is a crime of general intent. Thus, the district court did not err in precluding Burdeau from raising a voluntary intoxication defense.

## EXPERT TESTIMONY ABOUT THE ABSENCE OF FINGERPRINT EVIDENCE

■ Burdeau also claims that the district court erred when it allowed the state to question a government witness regarding the likelihood that an individual who touched an object would leave no identifiable fingerprints. During the trial, defense counsel had cross-examined the witness, an FBI agent, about the results of fingerprint tests conducted on the glass countertop and the gun. The witness reported that no identifiable fingerprints were found on the gun and that, although there were identifiable fingerprints

on the countertop, none matched Burdeau's.[1] On redirect, the state elicited testimony that identifiable fingerprints are almost never found on guns and only rarely found on other objects submitted for testing. The witness also offered possible explanations for the absence of such identifiable prints: the surface might not be conducive to fingerprints, skin can be too dry to leave a print, or fingers may be moved in a manner that smudges a print. Over the defendant's objection, the court allowed the testimony.

We do not find merit in Burdeau's contention that the expert testimony was irrelevant. The testimony aided the jury in understanding why Burdeau's fingerprints might not be found on items that the jury knew he had touched, which explanation would not otherwise have been readily apparent. We have in the past upheld the admission of expert testimony that explained the possible reasons why fingerprints would not be found on an object. *See United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir.1987) (upholding admission of testimony by FBI agent regarding why fingerprints are found in only ten percent of bank robbery cases); *United States v. Feldman*, 788 F.2d 544, 554–55 (9th Cir.1986) (admission of FBI agent's direct testimony regarding how often fingerprint evidence is discovered was proper).

In the one case in which this court upheld the exclusion of a witness's testimony on the absence of fingerprint evidence, there was no need for expert testimony to explain why fingerprints would not be found on the getaway vehicle, because the jurors could infer on their own that the car might have been wiped down following the crime. *See United States v. Booth*, 669 F.2d 1231, 1240 (9th Cir.1981). *See also Christophe*, 833 F.2d at 1300 (distinguishing *Booth* on this basis). By contrast, in this case, it would be more difficult for jurors to understand why Burdeau's fingerprints would not be found on the glass countertop when he had slammed his hand down on it and had had no opportunity to wipe it off. There were other important differences between *Booth* and the instant

case. In *Booth*, the court concluded that the government had failed to show that the witness was qualified to offer expert testimony on the absence of fingerprint evidence, *see Booth*, 669 F.2d at 1240, whereas in the instant case the defendant has not challenged the witness's qualifications. Furthermore, in *Booth* we did not hold that the district court *should have* excluded the evidence, but merely that it did not abuse its discretion by doing so. Here, Burdeau asks us to hold that the district court abused its discretion by *not* excluding the evidence, which we decline to do. For all of these reasons, *Booth* is distinguishable, and we hold that the testimony at issue was relevant and was properly admitted by the district court.

## IDENTIFICATION PROCEDURES

█ Burdeau also argues that the photographic array that was shown to the two witnesses was impermissibly suggestive, because his picture was placed in the center of the array, was darker than the rest, and was the only one in which the eyes were closed. He further alleges that this suggestive procedure tainted the witnesses' subsequent in-court identification, and that the district court should have arranged an in-court line-up to diminish the suggestiveness of the procedure.

We do not agree that the dark hue, facial expression, or placement of the photograph suggested that the witnesses should choose Burdeau's photograph. Such insubstantial differences between the defendant's photograph and the others do not in themselves create an impermissible suggestion that the defendant is the offender. *See United States v. Carbajal*, 956 F.2d 924, 929 (9th Cir.1992) (array not impermissibly suggestive when defendant's photograph was only one in which individual wore wig and had bruises on face); *United States v. Johnson*, 820 F.2d 1065, 1073 (9th Cir.1987) (photographic array was not impermissibly suggestive when defendant's photograph was hazier than others); *United States v. Sambrano*, 505 F.2d 284, 286 (9th Cir.1974) (photographic array in which defendant's photograph was darker

---

1. Defense counsel placed strong emphasis on the lack of fingerprint evidence in both his opening and closing statements.

and clearer was not impermissibly suggestive). The differences between Burdeau's photograph and the other five in the array in no way implied that the witnesses should identify him as the perpetrator.

 The district court also had no obligation to arrange an in-court lineup, since there was no need to dissipate the suggestive impact of the earlier identification. Certainly, we are in agreement with Burdeau that an in-court identification procedure in which the witness points out the defendant, who is seated at the table with counsel, is inherently suggestive and of minimal value. *See also United States v. Williams*, 436 F.2d 1166, 1168 (9th Cir.1970) (explaining that the physical setting of a trial suggests that witness should identify defendant). We therefore think it advisable to attempt to utilize procedures which minimize this prejudicial effect. Nonetheless, "[t]here is no constitutional entitlement to an in-court line-up or other particular method of lessening the suggestiveness of an in-court identification...." *United States v. Domina*, 784 F.2d 1361, 1369 (9th Cir.1986). In *United States v. Lumitap*, 111 F.3d 81 (9th Cir.1997), we commented, "[a]s long as the witness has an independent recollection that is wholly untainted by the police misconduct, an in-court identification is permissible." *Id.* at 85 n. 4. We conclude that the photographic array did not taint the clerks' identification of Burdeau. Although the district court had the discretion to employ an in-court lineup, it was not under any obligation to do so.

## REINSTATEMENT OF THE PLEA AGREEMENT

Finally, Burdeau argues that the district court made two errors, one when it allowed him to withdraw his plea after it had accepted the agreement and another, later, when it refused to reinstate the original plea agreement.

 Turning to Burdeau's first argument, no authority suggests to us that a district court is limited in its power to permit a defendant to withdraw a plea that has already been entered and accepted. Although Fed.R.Crim.P. 11(e)(4) mandates that the district court allow the defendant to withdraw his plea if the court rejects a conditional plea agreement, it does not preclude the court from doing so under other circumstances. In fact, Fed.R.Crim.P. 32(e) specifically allows the court to permit a defendant to withdraw a plea for "any fair and just reason" as long as the sentence has not yet been imposed. And while *United States v. Partida–Parra*, 859 F.2d 629, 632–33 (9th Cir.1988), held that a court, on the motion of the State, may not vacate a plea agreement it has already accepted, that decision imposed no similar limitation when it is the defendant who has made the request. The district court therefore was within its power to allow the defendant to withdraw his plea.

 Turning to the second argument, Burdeau acknowledges that no authority supports his claim that the district court was obligated to grant his request to reinstate the plea agreement, which capped the sentence at ten years, so that he could reenter his guilty plea under that agreement. He instead argues that, because his decision to withdraw his plea was based on a mistaken interpretation of the governing law, the district court should have exercised its equitable powers to reinstate the plea agreement.[2] It is not clear to us that such an action would have been within the district court's power, because the government refused to offer the same bargain at this later date. However, we need not reach this question, because in any event, the district court is not required to exercise its equitable powers in the manner suggested by the defendant. Moreover, neither the district courts nor the courts of appeals has the authority to insist that sentences be fair.

## CONCLUSION

Having concluded that the defendant's legal arguments are unavailing, we again ex-

2. Burdeau's brief on this appeal also states that he "was advised" that his witnesses would be available to testify in support of his voluntary intoxication defense. He does not specify who assured him of this fact, but if it was his own counsel, and if the assurance misrepresented the state of the governing law, then Burdeau may have a claim of ineffective assistance of counsel. Such a claim is properly raised in collateral proceedings.

press our concern over the result in this case. Burdeau had only one possible defense to this crime: voluntary intoxication. He exercised his right to seek a pre-trial determination whether this defense would be available to him. At oral argument, the government admitted that the availability of the defense was not clear to either side until the district court issued its ruling.

■■■ If ten years was a fair sentence for Burdeau's crime initially, then there appears to be no valid reason to add an extra seven and one-half years in prison because of his desire to obtain a pre-trial ruling regarding a potential legal defense. The government's only justification for its refusal to reinstate its plea offer is that it was forced to expend the time and resources required to prepare for trial a second time after the defendant withdrew his guilty plea. This does not seem to us to be an adequate reason in this case for almost doubling his sentence.

Under Federal Rule of Criminal Procedure 48(a), the government has the power to move to dismiss any count of the indictment as long as the defendant's appeal is pending and the decision is therefore not final. *See Ri-*

3. The only case in which this court has held that a Rule 48(a) motion was untimely was *Hirabayashi v. United States*, 828 F.2d 591, 607–08 (9th Cir.1987), in which the appellate proceedings had concluded over forty years earlier.

4. *See Calderon v. United States District Court for C.D.Cal.*, 128 F.3d 1283, 1286 n. 2 (9th Cir. 1997), *cert. denied*, — U.S. —, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998), *overruled on other grounds*, *Calderon v. United States District Court for C.D.Cal.*, 163 F.3d 530, 1998 WL 848032 (9th Cir.1998) ("[A] judgment does not become final following appeal until the case is returned to the district court and the mandate is spread.").

5. The dissent objects to our expression of concern about the injustice of the sentence and to our delay in issuing the mandate for sixty days to permit the United States Attorney's office to consider taking action concededly within its discretion. We will not comment on the first point because we think it unnecessary to do so. *See United States v. Harris*, 154 F.3d 1082, 1085 (9th Cir.1998) ("We urge Congress to reconsider its harsh scheme of mandatory minimum sentences without the possibility for parole."); *United States v. Pimentel*, 932 F.2d 1029, 1032, 1034 (2d Cir.1991) ("Our holding that Julio DeJesus's sentencing satisfied due process requirements does not mean that we are entirely happy with the

*naldi v. United States*, 434 U.S. 22, 25, 31, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977) (holding that the district court abused its discretion by refusing to grant Rule 48(a) motion to dismiss indictment even though defendant had already been convicted and sentenced); *United States v. Gonzalez*, 58 F.3d 459, 460 (9th Cir.1995) (same).[3] The government could make such a motion at any time before this court's mandate is issued and spread by the district court.[4] If the government were to dismiss the gun count, Burdeau's sentence could be reduced by five years. We urge the United States Attorney to consider making such a motion, in view of the unusual facts of this case and the unfairness of so severely increasing the sentence of an individual because he sought to clarify an unclear legal standard. We will withhold issuance of the mandate for a period of sixty days.[5]

**AFFIRMED.**

GRABER, Circuit Judge, concurring in part and dissenting in part:

I concur in the decision to affirm the judgment of conviction and in the majority's analysis leading to that holding.

manner of sentencing in this case.... [W]e invite Government attorneys to play a similar role in helping to ensure that guilty pleas indeed represent intelligent choices by defendants."); *United States v. Madkour*, 930 F.2d 234, 239–40 (2d Cir.1991) ("The district judge was troubled by the harsh sentence that he was compelled to impose.... We too are troubled, but unfortunately, have no power to disregard the clear mandate of congress, however ill-advised we might think it to be."); *United States v. McClinton*, 815 F.2d 1242, 1245 (8th Cir.1987) ("we would urge Congress to consider whether it intended the result reached here and whether the result is just"); *United States v. Shonubi*, 962 F.Supp. 370, 372 (E.D.N.Y.1997) ("Guideline sentences in drug cases involving couriers are often inordinately long—and substantially discriminatory in their effect on minorities").

We reject the charge that we neglect our responsibility by delaying issuance of the mandate for sixty days. We have affirmed Burdeau's seventeen-year sentence, and any reduction would leave him with more than ten years still to serve. The administrative action of issuing the mandate sixty days later will have no practical effect on anything in this case, with the possible exception of our court's compilation of its statistics. *See* Sup.Ct. R. 13. We place a far higher premium on fairness and justice than on the abstract concern over the date the mandate issues.

I dissent, however, from the majority's decisions (1) to withhold issuance of the mandate for sixty days, (2) to include a personal view of the wisdom of the outcome of the case, and (3) to advise the Executive Branch of government about how to exercise its discretion.

With respect to the first two points, I believe that the court's job is to decide the legal issues presented in the cases that come before it, as carefully, correctly, and promptly as possible. By delaying issuance of the mandate, the majority neglects our responsibility to decide cases promptly. The majority justifies the delay on the ground that it has a "concern over the result in this case" (majority at pp. 358–59), which to the majority "does not appear to be a fair" one (majority at pp. 354–55). But judges, in our decisional roles, are not asked for our personal preferences about the results of cases.[1]

With respect to the last point, judicial restraint is the lifeblood of judicial independence. This court has been vigilant to protect the work of the judicial branch from encroachment by the other branches of government. And this court has been right to be so. When we cross the line between our branch and the other branches, as I believe the majority has here, we ourselves begin to undermine the separation of powers.

For these reasons, I cannot join in the introduction and conclusion of the majority's opinion.

1. The majority points to several earlier cases (one from this court) that expressed frustration with the legally required result, but in none of those did the court stay the mandate to try to change that result.