No. 04-732

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 325

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

SWAN DELAVERGN SMITH,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC 2003-55,
Honorable C.B. McNeil, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Palmer A. Hoovestal, Hoovestal Law Firm, Helena, Montana

      For Respondent:

          Hon. Mike McGrath, Montana Attorney General, Ilka Becker,
Assistant Attorney General, Helena, Montana

          Robert J. Long, Lake County Attorney, Mitchell A. Young,
Deputy County Attorney, Polson, Montana

                    Submitted on Briefs:  July 26, 2005

                           Decided:  December 20, 2005

Filed:

_____
                        Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Swan Smith (Smith) appeals his conviction of deliberate homicide. We affirm.

## ISSUES

¶2    A restatement of the issues is:

¶3    Did the District Court abuse its discretion in denying Smith's motion for directed verdict?

¶4    Did the District Court abuse its discretion when it refused to instruct the jury on voluntary intoxication as a defense?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5    On April 29, 1999, Smith, and his girlfriend at the time, Mary Ann Cahoon (Cahoon), visited Smith's close friend, Raymond Dunwebber (Dunwebber). They arrived at Dunwebber's house in the late morning. Dunwebber's widow testified that she worked a 7 a.m. to 3 p.m. shift that day but that Dunwebber probably began drinking as soon as he got up that morning because that was his normal routine. She also testified that when Smith and Dunwebber came by her workplace around lunch time, they both smelled heavily of alcohol.

¶6    According to both Smith's and Cahoon's testimony, the two of them had been drinking and injecting methamphetamine for several days. Upon arriving at Dunwebber's house, they all three drank and Smith and Dunwebber smoked marijuana for several hours, during which time Dunwebber's wife came home from work. After a few more hours, Smith, Cahoon and Dunwebber decided to go for a drive, using Cahoon's car. Dunwebber's widow testified that as Dunwebber, Smith and Cahoon left, Dunwebber took with him her .38 caliber

2

revolver and a box of ammunition so they could do some target practicing. On the way out of town, they purchased a case of beer which they drank while driving around.

¶7     At some time during the evening, Smith and Dunwebber got into a heated argument, which eventually calmed. Shortly thereafter they stopped at a wooded area near St. Mary's Lake and set up cans for target practice. It was around this time that Smith and Dunwebber began arguing again. Smith testified that he was "kidding around" with Dunwebber but Dunwebber got angry, pointed his gun at Smith, and threatened to kill him if Smith did not quit taunting him. Smith claimed to know that Dunwebber had pulled guns on other people and had shot at others in the past. Smith said that when Dunwebber pointed the gun at him, he believed Dunwebber was going to kill him; therefore, when Dunwebber was not looking, he punched Dunwebber and disarmed him.

¶8     Smith attested that the men began fighting, screaming and punching each other, and at some point Dunwebber went down on the ground and was holding his head and face. Smith initially testified that he circled around Dunwebber while the two continued to scream and curse at each other but that he did not kick Dunwebber. He later equivocated. When asked if he kicked Dunwebber during the fight, he stated, "Yes, I suppose I did. I can't say if I did or didn't, it was just a fight. I don't know if I - - - I didn't mean to do any of it."

¶9     Smith claimed that while Dunwebber was on the ground he saw the gun on the ground and took it to the car. Upon returning to Dunwebber he found him unconscious. Smith maintained that he carried Dunwebber to the car and placed him on the ground. He tried to start the car but the battery was dead. While he was working on the car, Cahoon told him

3

that she thought Dunwebber had stopped breathing, but Smith testified that he did not believe her.

¶10   Upon realizing he could not get the car started, Smith and Cahoon left Dunwebber on the ground and pushed the car down a hill to the highway in a failed attempt to jump start it. About that time, a car came by and Smith and Cahoon caught a ride to Cahoon's nephew's house. They did not retrieve Dunwebber before leaving nor did they tell the people who gave them the ride that they had an injured friend who needed help. Cahoon's nephew accompanied them back to the car and helped them tow the car to Cahoon's house. Again, they did not mention Dunwebber, or check on his condition. Smith claimed that he was so drunk he "forgot" to check on him.

¶11   After installing a new battery in Cahoon's car, Smith returned to get Dunwebber, testifying that he expected Dunwebber to be walking home. Smith acknowledged, however, that it had been several hours since Dunwebber had been injured and had Dunwebber been able to walk home, he probably would have arrived there by the time Smith returned. When he arrived Dunwebber was in the same place where they had left him. Smith stated that he put Dunwebber in the car, began to drive, and then realized Dunwebber was dead. He stopped the car, put Dunwebber's body in the woods and left it. Smith repeatedly testified that he never intended to hurt or kill Dunwebber.

¶12   Cahoon offered somewhat different testimony pertaining to the fight and its aftermath. She testified that after they arrived at St. Mary's Lake, she and Dunwebber set up a beer can and shot at it a few times. She then passed the gun to Smith at which time he began taunting

4

Dunwebber again. This re-ignited their previous argument and matters quickly escalated into a physical fight. Cahoon said Smith's face got red and wild, and his eyes bulged. She attempted to stop the fight but Smith yelled at her to get in the car. From the car, Cahoon's view of the fight was partially obstructed by brush but she told the jury that after Smith knocked Dunwebber down a second time and she could no longer see Dunwebber, she saw Smith circling around the area where she presumed Dunwebber was on the ground, and that Smith was making kicking motions repeatedly. She never actually saw Smith kick Dunwebber because her view of the ground was blocked. She testified that when Smith returned to the car, he told her he thought Dunwebber was not breathing.

¶13 Cahoon further testified that Smith instructed her to tell anyone who asked that at the end of the evening, they had dropped Dunwebber off at a local restaurant. She also claimed that Smith threatened to harm her son if she told anyone about what had happened to Dunwebber. Dunwebber's body was not found until May 2, 2003. Neither Cahoon nor Smith told anyone of the events of April 29, 1999, until after Dunwebber's body was found.

¶14 On May 5, 2003, Dr. Skelton, an anthropology professor who specializes in forensic anthropology, examined Dunwebber's remains. He identified two skull fractures which had been caused by blunt force trauma but that came from two separate events. He later testified that the fractures occurred "perimortem," which means "around the time of death," as opposed to premortem (before death) or postmortem (after death). Dr. Skelton also explained, however, that perimortem could actually be several days before death through

5

several weeks after death. From his examination of Dunwebber's remaining bones, Dr. Skelton could not state a cause of death.

¶15 Dr. Lindholm, an expert forensic pathologist, also examined Dunwebber's remains. He testified at trial that, based on his examination, he concluded that the "manner of death" was "homicidal violence." He explained that this was a forensic term used to classify death. Other terms used by forensic scientists to classify death include "natural" (*i.e.*, death by disease), suicide, and accident. He further explained that the term "homicide," as used in his field, did not include an "intent" element. It simply meant that two humans had a physical altercation and one died. He also testified that the type of skull fracture Dunwebber experienced was not likely the result of a fall to the ground because the fracture was on top of the skull rather than in the back of the skull.

¶16 On May 7, 2003, the Deputy Lake County Attorney filed an Information charging Smith with the deliberate homicide of Dunwebber. On May 14, 2003, the county attorney amended the Information to include two additional felony charges, *i.e.*, "tampering with or fabricating physical evidence," and "tampering with witnesses and informants." On May 28, 2003, Smith entered a "not guilty" plea.

¶17 A trial was held from April 5 - 7, 2004. At the close of the evidence, Smith moved the court for a directed verdict of not guilty on the deliberate homicide charge, on the grounds that the evidence was insufficient to establish that Smith had "purposely and knowingly caused" Dunwebber's death. From the bench and without explanation, the District Court denied Smith's motion. Subsequently, during jury instruction negotiations, Smith proposed a

jury instruction that would allow the jury to consider evidence of his intoxication in deciding whether the State had proved beyond a reasonable doubt that he acted with the intent to commit deliberate homicide. The court declined to give Smith's proposed instruction, deciding instead to instruct the jury in accordance with § 45-2-203, MCA, which states, in relevant part, that a person who is intoxicated is criminally responsible for his conduct and such intoxication may not be considered in determining the existence of a mental state.

¶18 The jury was given the option of convicting Smith of deliberate homicide, or the lesser included offenses of mitigated deliberate homicide or negligent homicide. The jury convicted Smith of deliberate homicide, tampering with or fabricating physical evidence, and tampering with witnesses and informants. He was sentenced to life imprisonment on the deliberate homicide count and to ten years at Montana State Prison for each of the tampering counts, to run consecutively. He appeals.

## STANDARDS OF REVIEW

¶19 The standard of review of a district court's denial of a motion for a directed verdict is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Flowers*, 2004 MT 37, ¶ 20, 320 Mont. 49, ¶ 20, 86 P.3d 3, ¶ 20 (citation omitted).

¶20 We review jury instructions to determine whether the instructions as a whole fully and fairly instruct the jury on the applicable law. A district court has broad discretion in formulating jury instructions, and our standard of review is whether the court abused that

7

discretion. *State v. Meyer*, 2005 MT 215, ¶ 14, 328 Mont. 247, ¶ 14, 119 P.3d 1214, ¶ 14 (citation omitted).

## DISCUSSION

¶21 *Did the District Court abuse its discretion in denying Smith's motion for directed verdict?*

¶22 A person commits "deliberate homicide" when the "person purposely or knowingly causes the death of another human being." Section 45-5-102(1)(a), MCA. The court instructed the jury that a person acts "purposely" with respect to a result if it is the person's "conscious object to cause that result." The jury was also instructed that a person acts "knowingly" with respect to the result of conduct when the person is "aware that it is highly probable that the result will be caused by the person's conduct." Additionally, the District Court instructed the jury as to the meaning of "mitigated deliberate homicide" and "negligent homicide."

¶23 Smith contended that the State failed to prove beyond a reasonable doubt that he "purposely and knowingly caused" Dunwebber's death. He maintained that the evidence may have established that he had acted "negligently," but did not establish that his "conscious object" was to cause Dunwebber's death. Smith posited that the District Court should have directed a verdict of acquittal as to the deliberate homicide charge, and allowed the lesser included charge of negligent homicide to go to the jury. He maintains the District Court abused its discretion when it denied his motion for a directed verdict.

8

¶24 The State countered that the evidence provided by Cahoon, albeit circumstantial in nature, was legitimately presented and, in conjunction with the testimony of Dr. Skelton, was sufficient for the jury to conclude that Smith caused Dunwebber's death by purposely and knowingly kicking him while he was on the ground. *State v. Lancione,* 1998 MT 84, ¶ 37, 288 Mont. 228, ¶ 37, 956 P.2d 1358, ¶ 37 ("[C]ircumstantial evidence alone is sufficient to obtain a conviction. Circumstantial evidence must only be of such a 'quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt,' and all the facts and circumstances must be considered collectively." (internal citations omitted)).

¶25 As the preceding summary of the evidence indicates, there were substantial conflicts between Cahoon's and Smith's versions of the events. If the jury accepted Cahoon's version, then it could conclude that a deliberate homicide occurred. Moreover, the jury also heard the testimony of the two expert witnesses who established that Dunwebber sustained skull fractures as a result of blunt force trauma. We have previously held that a directed verdict is proper only when there is a complete absence of any evidence which would justify submitting an issue to a jury. Where the evidence is conflicting or doubtful, the court should not invade the province of the jury by directing a verdict. *State v. Gonyea* (1987), 225 Mont. 56, 59, 730 P.2d 424, 426 (citations omitted). Here, there was enough evidence to justify submitting the case to the jury. Therefore, we cannot conclude that the District Court abused its discretion in denying Smith's motion for a directed verdict.

¶26 *Did the District Court abuse its discretion when it refused to instruct the jury on voluntary intoxication as a defense?*

¶27    Smith also argues that the District Court abused its discretion when it refused to instruct the jury that it may consider evidence of Smith's intoxication when deciding whether he acted with the intent to commit deliberate homicide.  Acknowledging that § 45-2-203, MCA, expressly prohibits the fact-finder from considering intoxication when determining the existence of a mental state as an element of a criminal offense, Smith posits that the statute violates his due process rights as guaranteed by the federal Constitution.  He argues that the U. S. Supreme Court has repeatedly struck down state evidentiary rules which arbitrarily or mechanistically operate to exclude evidence which is material and relevant to the defense.

¶28    Section 45-2-203, MCA, states:

> Responsibility -- intoxicated condition.  A person who is in an intoxicated condition is criminally responsible for his conduct and an intoxicated condition is not a defense to any offense and may not be taken into consideration in determining the existence of a mental state which is an element of the offense unless the defendant proves that he did not know that it was an intoxicating substance when he consumed, smoked, sniffed, injected, or otherwise ingested the substance causing the condition.

¶29    Addressing Smith's due process claim, we note that the United States Supreme Court has already decided this issue.  In *Montana v. Egelhoff* (1996), 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361, the Supreme Court was specifically asked to determine whether § 45-2-203, MCA, violated a defendant's right to due process under the federal Constitution.  In a lengthy legal analysis, the Court acknowledged that early common law embraced the rule that disallowed a defendant from using voluntary intoxication as a defense to a finding of the requisite *mens rea* for a crime.  The Supreme Court also recognized that by the nineteenth century, many courts had "carved out an exception to the common law's traditional across-

10

the-board condemnation of the drunken offender, allowing a jury to consider a defendant's intoxication when assessing whether he possessed the mental state needed to commit the crime charged, where the crime was one requiring a 'specific intent.'" *Egelhoff*, 518 U.S. at 46, 116 S.Ct. at 2018-19, 135 L.Ed.2d at 369-70.[1]  Despite the wide acceptance of this "new view," the Supreme Court concluded that Egelhoff failed to show that it qualifies as a "fundamental" federal Constitutional right.  Justice Scalia, writing for the majority, stated:

> Although the rule allowing a jury to consider evidence of a defendant's voluntary intoxication where relevant to *mens rea* has gained considerable acceptance, it is of too recent vintage, and has not received sufficiently uniform and permanent allegiance, to qualify as fundamental, especially since it displaces a lengthy common-law tradition which remains supported by valid justifications today.

*Egelhoff*, 518 U.S. at 51, 116 S.Ct. at 2021, 135 L.Ed.2d at 372-73.

---

[1]  Between 1973 and 1985, Section 94-2-109, MCA (re-numbered 45-2-203, MCA), expressly allowed that "An intoxicated or drugged condition may be taken into consideration in determining the existence of a mental state which is an element of the offense."  In 1987, the Legislature changed § 45-2-203, MCA, to expressly state that intoxication may not be so considered.  *See also State v. Sage* (1986), 221 Mont. 192, 199, 717 P.2d 1096, 1100.

The Supreme Court ultimately concluded that,

> The people of Montana have decided to resurrect the rule of an earlier era, disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue. Nothing in the Due Process Clause prevents them from doing so . . . .

*Egelhoff*, 518 U.S. at 56, 116 S.Ct. at 2024, 135 L.Ed.2d at 376.

¶30    Additionally, Smith maintains that compliance with the statute violates the Supremacy Clause of the U.S. Constitution. Citing the Ninth Circuit decision, *U.S. v. Burdeau* (9th Cir. 1999), 168 F.3d 352, he asserts that because the *Burdeau* court "held" that a "defense based on voluntary intoxication is available for a specific intent crime," this holding constitutes a "federal law" that Montana must follow under the Supremacy Clause of the U.S. Constitution. We conclude this issue too is without merit.

¶31    The issue before the Ninth Circuit Court of Appeals in *Burdeau* was whether an armed robbery committed by Burdeau, a Montana resident, was a "general intent" crime, or a "specific intent" crime. The case was appealed to the Ninth Circuit in part because the Montana federal court determined that armed robbery was a "general intent" crime, and therefore Burdeau did not have the right to the "voluntary intoxication" defense. The Ninth Circuit agreed and held that the district court did not err in precluding Burdeau from raising a voluntary intoxication defense. While the Ninth Circuit's language may imply that had Burdeau's crime been a "specific intent" crime, he may have been able to assert such a defense, the statute at issue in the case before us was neither raised nor addressed by the Ninth Circuit. Therefore, we conclude that *Burdeau* is not controlling in the case at bar.

12

¶32　Moreover, it is well-established that "[i]n passing on federal constitutional questions, the state courts and the lower federal courts have the same responsibility and occupy the same position; there is a parallelism but not paramountcy for both sets of courts are governed by the same reviewing authority of the Supreme Court." *Freeman v. Lane* (7th Cir. 1992), 962 F.2d 1252, 1258 (citations omitted). We therefore are not constrained by the Ninth Circuit's decision in any event.

¶33　Lastly, as stated above, we review jury instructions to determine whether the instructions, viewed in their entirety, fully and fairly instruct the jury as to the law applicable to the case. *Meyer*, ¶ 14. We conclude that the instructions given by the District Court, when viewed as a whole, fully and fairly instructed the jury on the applicable law. We hold, therefore, that the District Court did not abuse its discretion in denying Smith's request for a jury instruction on voluntary intoxication.

## CONCLUSION

¶34　For the foregoing reasons, we affirm the District Court.


　　　　　　　　　　　　　　　　　　　　/S/ PATRICIA O. COTTER


We Concur:

/S/ JOHN WARNER

/S/ W. WILLIAM LEAPHART

13

/S/ BRIAN MORRIS

Justice James C. Nelson concurs.

¶35   I concur in our decision, noting, however, my continuing disagreement with the matter discussed in Issue 2.  *See State v. McCaslin*, 2004 MT 212, ¶ 51, 322 Mont. 350, ¶ 51, 96 P.3d 722, ¶ 51 (Nelson, J., dissenting and concurring).  I also agree with Justice Cotter's dissent and concurrence in that same case.  *See McCaslin*, ¶ 52 (Cotter, J., dissenting and concurring).  At such point in time as there are two other votes to reconsider this issue, I stand ready to overrule *McCaslin* and proceed in accordance with our decision in *State v. Egelhoff* (1995), 272 Mont. 114, 900 P.2d 260, *reversed by Montana v. Egelhoff*, 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), but on independent state grounds.

¶36   I concur with that caveat.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins in the concurrence of Justice James C. Nelson.

/S/ PATRICIA O. COTTER