DA 11-0499

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 252

STATE OF MONTANA,

Plaintiff and Appellee,

v.

JAY J. MYRAN,

Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 09-158A
Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Colin M. Stephens, Smith & Stephens, P.C., Missoula, Montana

For Appellee:

Steve Bullock, Montana Attorney General; Tammy K Plubell, Assistant
Attorney General, Helena, Montana

Marty Lambert, Gallatin County Attorney, Bozeman, Montana

Submitted on Briefs:   September 26, 2012

Decided:   November 8, 2012

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Defendant Jay J. Myran ("Jay") appeals his conviction of deliberate homicide in the Eighteenth Judicial District Court, Gallatin County. We affirm.

## ISSUE

¶2 We restate the sole issue on appeal as follows:

¶3 Did the District Court err by instructing the jury on intoxication in accordance with § 45-2-203, MCA, because the statute violates a criminal defendant's due process right to present a defense?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Jay's appeal follows his conviction for deliberate homicide stemming from the shooting of Gayle Brewster ("Gayle"), his former roommate in Three Forks, Montana. Gayle rented a trailer from Vickie Veltkamp ("Vickie") on Pyfer Road outside Three Forks beginning in November 2008. Jay joined Gayle as a roommate, although there is some indication that the two had previously had a more intimate relationship. Sometime in March 2009, Jay's son L.M. came to live with them. L.M.'s presence in the small trailer apparently added to burgeoning tensions between Jay and Gayle.

¶5 Gayle and Jay frequently drank alcohol together at night, and often argued. On the day of Gayle's death, May 12, 2009, Jay drank with Gayle and his friend and sometime co-worker Aaron Bruce ("Aaron"). Jay, Gayle, and Aaron had been drinking since the afternoon. Gayle and Jay had begun to argue, apparently over whether Gayle could use Jay's truck. L.M. and Bruce testified that during the course of the argument, Jay repeatedly said,

2

"Let's kill Gayle." L.M. did not consider this to be more than "drunk talk," although Jay had made similar statements for weeks.

¶6 Aaron left sometime during the late afternoon, and Jay and Gayle continued to fight and drink. According to L.M., Gayle eventually retreated to her room. Jay continued to say "Let's kill Gayle," but L.M. still considered it to be "drunk talk." At some point, Jay took out his .410 shotgun and set it on a turtle cage by the trailer door. Jay testified that he took the gun out with the intention to shoot rabbits. At some later point, Gayle exited her room and the argument resumed. L.M. was playing video games in the same room, and he testified that he saw Jay take out a shell and load the shotgun while arguing with Gayle. L.M. testified that Jay then raised the gun towards Gayle, Gayle walked towards him and put the gun in her mouth, said "Do it, Cowboy," and the gun went off, killing Gayle. L.M. did acknowledge at trial that he previously told two Gallatin County detectives that Jay put the gun in Gayle's mouth. After the gun went off, Jay walked over to L.M. and asked him, "Now you think you have what it takes to be in the military?" Jay then put Gayle's body on a rug and moved it onto the porch. After he cleaned up the blood, Jay continued to drink and eventually fell asleep. Jay claimed he had no recollection of saying "Let's kill Gayle" or taking the shotgun out, loading it, or cocking it. He has continued to maintain that the shooting was an accident, a result of his drunken brandishing of the loaded weapon and Gayle "jerking" it towards her mouth.

¶7 The next morning, May 13, 2009, Jay woke up L.M. and ordered him to help put Gayle's body in a burn barrel outside. They put the body in the barrel and Jay started a fire,

stoking it throughout the day. Jay withheld L.M. from school to prevent him from talking about the incident and told L.M. to avoid talking about Gayle in the past tense.

¶8 Vickie was on vacation at the time of Gayle's death, and she and her husband returned to Three Forks on May 24, 2009. Vickie generally asked Gayle to watch the house, water the plants, and feed her cat while they were away. However, when she returned on May 24, the cat had not been fed, the plants were dying, and the mail had not been collected. Vickie tried to contact Gayle over the next several days but was unsuccessful. Vickie also noticed that the brush surrounding the burn barrel had been burned, indicating it had been used contrary to Vickie's instructions not to. Vickie did not see Gayle or her dog Boomer, but Jay and L.M. were still around. Vickie called law enforcement on May 27, 2009, and reported Gayle missing.

¶9 Two Gallatin County Sheriff's Office deputies visited Jay at the trailer following Vickie's call on May 27, 2009. The deputies informed Jay that Gayle had been reported missing, and he said Gayle had been gone for "some time." When the deputies looked in Gayle's room, they noticed her inhalers, wallet, purse, and cell phone remained.

¶10 The next day, Jay informed Vickie that he and L.M. would be moving as soon as L.M. was out of school. Jay told Vickie he had a job lined up in Billings, Montana. Jay and L.M. left shortly after L.M. came home from school on May 29, 2009. When Vickie inspected the trailer, she noticed that only Gayle's possessions remained.

¶11 The Gallatin County Sherriff's Office organized a search for Gayle. On June 6, 2009, a member of the search team noticed a bone in the burn barrel. A medical examiner was able to identify and collect 34 pieces of human bone from the barrel. One fragment of tibia had

4

two surgical screws and a piece of fibula had a metal plate. This surgical hardware matched what had been used to repair a broken ankle Gayle suffered in 2006.

¶12 Gallatin County detectives found Jay in Billings, Montana, on June 9, 2009. Jay signed a waiver of rights and agreed to an interview. During the interview, Jay confessed that Gayle "came out and put that shotgun in her mouth, bud." Jay denied pointing the gun at Gayle and claimed that an inadvertent "jerk" caused the gun to go off. Jay further claimed that he burned the body to protect his son.

¶13 Jay was charged with deliberate homicide, § 45-5-102(1)(a), MCA, and tampering with physical evidence, § 45-7-207, MCA, by information on June 24, 2009. As a defense at trial, Jay asserted that he was guilty of negligent homicide based on his intoxicated condition and supposedly reckless behavior with the shotgun. During the settling of instructions, the State proposed an instruction on intoxication pursuant to § 45-2-203, MCA. The State's Proposed Instruction 7 read:

> A person who is in an intoxicated condition is criminally responsible for his conduct and an intoxicated condition is not a defense to any offense and may not be taken into consideration in determining the existence of a mental state which is an element of the offense unless the Defendant proves that he did not know that it was an intoxicating substance when he consumed the substance causing the condition.

¶14 Following some prompting by the court, defense counsel objected to State's Proposed Instruction 7. The defense claimed the objection was based on "impermissible burden shifting and also due process consistent with Justice Nelson's dissent and Justice Cotter's dissent [in *State v. McCaslin*, 2004 MT 212, 322 Mont. 350, 96 P.3d 722] concluding that *Egelhoff* [*State v. Egelhoff*, 272 Mont. 114, 900 P.2d 260 (1995)] should stand on

5

independent state grounds." The court overruled the objection and gave the jury the instruction as Court's Instruction 19. The court also instructed the jury on, *inter alia*, deliberate homicide, the State's burden of proof, the presumption of innocence, the union of the criminal act and mental state, and negligent homicide. The jury thereafter convicted Jay of deliberate homicide.

¶15 The District Court sentenced Jay to 100 years for the deliberate homicide, 10 years for tampering with evidence, and an additional 10 years for the use of a firearm, all to be served consecutively in Montana State Prison. No time was suspended and the court found Jay ineligible for parole. Jay's appeal followed.

## STANDARD OF REVIEW

¶16 We review jury instructions in criminal cases "to determine whether the instructions as a whole fully and fairly instruct the jury on the applicable law." *State v. Smith*, 2005 MT 325, ¶ 20, 329 Mont. 526, 127 P.3d 353. District courts are given broad discretion when instructing a jury, and "reversible error will occur only if the jury instructions prejudicially affect the defendant's substantial rights." *State v. Strauss*, 2003 MT 195, ¶ 47, 317 Mont. 1, 74 P.3d 1052. Moreover, statutes are presumed to be constitutional, and the challenger bears the burden of proving that the statute is unconstitutional by beyond a reasonable doubt, and any doubts are resolved in favor of the statute. *State v. Turbiville,* 2003 MT 340, ¶ 18, 318 Mont. 451, 81 P.3d 475.

## DISCUSSION

¶17　*Did the District Court err by instructing the jury on intoxication in accordance with*

*§ 45-2-203, MCA, because the statute violates a criminal defendant's due process right to*

*present a defense?*

¶18　*A. Is Jay's appeal properly before this Court?*

¶19　During the settling of instructions, the following colloquy occurred between the court

and defense counsel:

> THE COURT: State's 7 is the intoxication instruction. The intoxicated condition is not a defense; a person is still criminally responsible for his conduct. Mr. Ohman, is there any record you want to make?
>
> COUNSEL: Your Honor, I don't—I mean, this is right out of the statute and I mean that's the law. It went up to the U.S. Supreme Court so it's not like we can argue against it.
>
> THE COURT: Did you read State v. McCaslin?
>
> COUNSEL: I did not read State v. McCaslin.
>
> THE COURT: Would you like to?
>
> COUNSEL: Sure.
>
> THE COURT: And along with it, State vs. Smith.
>
> COUNSEL: Okay. Thank you.
>
> THE COURT: To save time, you can skip to the Dissent.
>
> . . .
>
> COUNSEL: Your Honor, based on those rulings, I would submit to the Court that we'd object to Instruction No. 7 based on impermissible burden shifting and also due process consistent with Justice Nelson's dissent and Justice Cotter's dissent concluding that *Egelhoff* should stand on independent state grounds.

7

The State argues, based on this exchange, that Jay has improperly changed the basis of his objection from burden shifting to preventing him from presenting his defense. However, from the record, it appears that Jay's objection was based on *both* "impermissible burden shifting and also due process consistent with Justice Nelson's dissent and Justice Cotter's dissent" in *McCaslin*. This objection was timely made during the settling of instructions and stated the matter objected to and grounds for objection. Section 46-16-410(3), MCA. The general rule that we will not address either an issue raised for the first time on appeal or a changed legal theory is based on considerations of judicial economy and the "unseemly" nature of "telling a lower court it was wrong when it was never presented with an opportunity to be right." *State v. West*, 2008 MT 338, ¶ 16, 346 Mont. 244, 194 P.3d 683. Given that the court solicited the objection and suggested the general grounds, we cannot conclude that his overall theory was not presented to the trial court and therefore it is properly before us.

¶20    *B. Does § 45-2-203, MCA, violate a defendant's right to due process under the Montana Constitution?*

¶21    Jay argues that the court erred by instructing the jury it was prohibited from considering Jay's intoxication when rendering its verdict. Jay argues that this is especially the case given that his theory of defense was that his actions amounted to negligent homicide, rather than deliberate, in part because of his intoxication. Instruction 19 effectively mirrors the language of § 45-2-203, MCA. As a result, he claims that § 45-2-203, MCA, violates the Montana Constitution insofar as it does not allow the jury to consider a defendant's theory of defense involving an intoxicated condition.

8

¶22 In response, the State contends that not only was Jay able to fully present his defense concerning intoxication and negligent homicide to the jury, but that Jay has also failed to establish that the Montana Constitution provides a greater right to present a defense than the United States Constitution. We agree with the State.

¶23 Jay essentially contends that the Montana Constitution affords him a greater right to present a defense than the U.S. Constitution. In doing so, he acknowledges that the United States Supreme Court has found that § 45-2-203, MCA, does not violate the Due Process Clause of the U.S. Constitution. *See Montana v. Egelhoff*, 518 U.S. 37, 56, 116 S. Ct. 2013, 2024 (1996). We have also considered, and rejected, a similar challenge to § 45-2-203, MCA, under Montana's Due Process Clause, Article II, Section 17 of the Montana Constitution. *See State v. McCaslin*, 2004 MT 212, 322 Mont. 350, 96 P.3d 722, *rev'd in part on other grounds, State v. Herman*, 2008 MT 187, 343 Mont. 494, 188 P.3d 978. In *McCaslin*, the defendant asserted a justifiable use of force defense to charges stemming from a drunken brawl. The trial court instructed on voluntary intoxication pursuant to § 45-2-203, MCA, and the jury convicted McCaslin on three of the charges. On appeal, he argued that the intoxication instruction improperly shifted the burden of proof by creating a conclusive presumption of criminal responsibility and that it also violated his right to due process under Article II, Section 17 of the Montana Constitution. *McCaslin*, ¶¶ 20-21. We dismissed his first contention by noting that the instruction "is not a mandate to the jury to convict . . . [r]ather, it informs the jury that voluntary intoxication does not exculpate otherwise criminal conduct in accordance with *Egelhoff* . . . ." *McCaslin*, ¶ 25; *see also Egelhoff*, 518 U.S. at 56, 116 S. Ct. at 2024. Regarding McCaslin's second contention, we determined that as the

9

United States Supreme Court had found that § 45-2-203, MCA, did not violate the Federal Due Process Clause, there was "no reason to reach a different result" when considering Article II, Section 17's identical language. *McCaslin*, ¶ 24.

¶24 Jay attempts to work around our holding in *McCaslin* by alleging that § 45-2-203, MCA, violates what he calls the Montana Constitution's "enhanced" due process protections found outside Article II, Section 17. However, Jay does not point to a specific section to support this contention. Instead, he argues that these enhanced procedural protections "permeate the entirety of the Montana Constitution" and emanate from the "penumbra" of Article II.

¶25 As Jay claims that Montana's conception of the right is broader than its federal counterpart, he "must establish sound and articulable reasons that the Montana Constitution affords greater protection for a particular right." *State v. Covington*, 2012 MT 31, ¶ 20, 364 Mont. 118, 272 P.3d 43. Jay has three avenues through which he can establish the Montana Constitution provides the enhanced due process right to present a defense which he claims. Jay can identify unique language within the Montana Constitution, he can reference Constitutional Convention transcripts and committee reports, or he may establish that the alleged right must be read in conjunction with rights that are uniquely Montanan. *Covington*, ¶ 21. Because Article II, Section 17 of the Montana Constitution mirrors the Due Process Clause of the Federal Constitution, the first avenue is unavailable.[1] Jay has cited nothing in

---

[1] Article II, Section 17 of the Montana Constitution reads: "Due process of law. No person shall be deprived of life, liberty, or property without due process of law." This section is derived from, and identical to, Article II, § 27 of Montana's 1889 Constitution and the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution.

10

the background materials to Montana's Constitutional Convention that shows the delegates contemplated a greater right to present a defense. *Covington*, ¶ 25. Instead, by referencing our Constitution's alleged emanations and penumbras, Jay appears to have taken the third route, and must demonstrate that a broader right to present a defense must be read in conjunction with other uniquely Montanan rights.

¶26 Jay attempts to do this by pointing to Article II's enumeration of various due process rights and listing the occasions on which we have held that the Montana Constitution provides greater due process protections. However, just because Article II lists due process rights not found in the Federal Constitution does not, by itself, establish that our Constitution countenances a broader right to present a defense. When we have previously found that the Montana Constitution affords greater rights, it has been based on demonstrably unique language, *see State v. Dunn*, 2007 MT 296, ¶ 11, 340 Mont. 31, 172 P.3d 110, or a finding that the combined operation of unique constitutional provisions, when coupled with a strong tradition of greater respect for that right, commanded a recognition of a greater state-based right. *See State v. Bullock*, 272 Mont. 361, 383-84, 901 P.2d 61 (1995). Here, in support of his argument, Jay points to Article II, Sections 3, 4, 8, 9, 15, 16, 17, 24, 26, and 31 of the Montana Constitution as examples of Montana's greater enumeration of due process-related rights. From this list, Jay asserts that a right to a complete defense necessarily follows. However, at no point does Jay establish why his litany of Montana constitutional protections necessarily supports the recognition of a right to present a complete defense broader than that afforded by the U.S. Constitution. Nor does he establish a strong Montana tradition of recognizing a greater right to present a defense. Indeed, we have previously recognized that

11

the right to present a defense is *not* absolute under the Montana Constitution, *see State v. Ahto*, 1998 MT 200, ¶ 16, 290 Mont. 338, 965 P.2d 240; *State v. Johnson*, 1998 MT 107, ¶ 23, 288 Mont. 513, 958 P.2d 1182, and this proposition has been firmly rejected by the U.S. Supreme Court. *See U.S. v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261 (1998); *Michigan v. Lucas*, 500 U.S. 145, 151, 111 S. Ct. 1743 (1991); *Taylor v. Illinois*, 484 U.S. 400, 410-11, 108 S. Ct. 646 (1988). As Jay has failed to establish that the Montana Constitution provides a greater right to present a defense than its federal counterpart, we find no reason to depart from these prior holdings.

¶27 We must note, however, that Jay fully presented his defense of negligent homicide, including evidence of his intoxication, at trial. The court did not prevent Jay from presenting testimony concerning his intoxication. Further, as Jay admits on appeal, "the State did not object to [Jay's] testimony that the negligence of his actions were [sic] rooted in the 'alcohol factor.'" The defense counsel's opening statement focused on Jay's heavy drinking and drunken state on May 12, 2009. Their closing argument alleged that Jay's conduct amounted to negligent homicide primarily due to his intoxication and Gayle's own allegedly negligent actions. Testimony was presented that Jay and Gayle consumed roughly 24 beers every day. L.M. testified that Jay began drinking the morning of May 12, 2009, and was drunk by the time he and Gayle began to argue that afternoon. Jay testified that he was an alcoholic, and stated that he had "at least an 18-pack" of beer the day of Gayle's death. He described his conduct as "pretty reckless," and testified that "no reasonable person" would, while intoxicated, stand with a loaded gun and have an argument in a small trailer living room. He specifically alleged that his recklessness was due to the "alcohol factor." Following

considerable argument and testimony on Jay's intoxication, the court instructed the jury on negligent homicide. Jay cannot be heard to complain that he was not allowed to present evidence of his intoxicated condition at trial.

¶28 In light of the above, we find that Instruction 19 did not prejudice Jay's right to due process. The intoxication instruction "merely advised the jury that intoxication does not excuse *otherwise criminal conduct*." *Kills On Top v. State,* 273 Mont. 32, 50, 901 P.2d 1368 (1995) (emphasis added). The Instruction did not mandate that the jury must find Jay guilty if they found he was intoxicated. *See McCaslin*, ¶ 25; *Kills On Top*, 273 Mont. at 50, 901 P.2d at 1380. Jay did not argue that he was incapable of forming the requisite *mens rea* for deliberate homicide because of his intoxication, or that his intoxicated state excused his actions. Instead, Jay essentially argued the victim negligently jerked the gun as he negligently handled it, causing it to go off. Instruction 19 did not prevent the jury from considering Jay's intoxication in relation to this theory, and Jay has failed to show how the Instruction prejudiced his alleged right to present a defense. Even if the jury found that Jay was inebriated, the State still had the burden to prove each element of deliberate homicide beyond a reasonable doubt to establish criminal responsibility. *McCaslin*, ¶ 25. Thus, when we read the instructions as a whole, we conclude that Instruction 19 did not violate Jay's right to due process under Article II of the Montana Constitution.

## CONCLUSION

¶29 Because we conclude that the instructions given by the court fully and fairly instructed the jury on the applicable law and did not prejudice Jay's right to present a defense, the District Court did not abuse its discretion by giving Instruction 19 to the jury.

13

¶30     Affirmed.

                                            /S/ MICHAEL E WHEAT

We Concur:

/S/ JIM RICE


/S/ BETH BAKER
/S/ BRIAN MORRIS



Justice Patricia O. Cotter concurs.

¶31     I continue to agree with Justice Nelson's special concurrence in *State v. Egelhoff,* 272

Mont. 114, 900 P.2d 260 (1995), *rev'd, Montana v. Egelhoff*, 518 U.S. 37, 116 S. Ct. 2013

(1996), to the effect that the language of § 45-2-203, MCA, which precludes the jury from

taking into consideration the intoxicated condition of the defendant "in determining the

existence of a mental state which is an element of the offense," also "effectively and

impermissibly relieves or lessens the burden of the State to prove beyond a reasonable doubt

an essential element of the offense charged . . . ." *See State v. McCaslin*, 2004 MT 212, ¶ 51,

322 Mont. 350, 96 P.3d 722 (Nelson and Cotter, JJ., concurring and dissenting), *overruled*

*on other grounds, State v. Herman,* 2008 MT 187, ¶ 12, 343 Mont. 494, 188 P.3d 978; *State*

*v. Smith*, 2005 MT 325, ¶ 35, 329 Mont. 526, 127 P.3d 353 (Nelson and Cotter, JJ.,

concurring).  Thus, it is my contention that the statute wrongly reduces the State's burden of

proof, not that the statute violates the right of a defendant to present a complete defense.

14

¶32 As the Court notes, Jay preserved his arguments regarding both impermissible burden shifting and the right to present a defense. Opinion, ¶ 19. However, Jay focused his considerable efforts in appellate briefing upon the argument that the statute denies him the right to put on a defense. He did not provide independent state authority for the proposition that the statute shifts the burden of proof of an essential element of the crime away from the State, in violation of the Montana Constitution. As we noted in ¶ 35 of *Smith*, such authority is required, in light of *Montana v. Egelhoff*.

¶33 I therefore concur.

/S/ PATRICIA COTTER