No. 05-610

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 35

LARRY DEWAYNE ADAMS,

          Petitioner and Appellant,

   v.

STATE OF MONTANA,

          Respondent and Respondent.

APPEAL FROM:    The District Court of the Twenty-First Judicial District,
                  In and For the County of Ravalli, Cause No. DC-98-144,
                  Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Sasha K. Brownlee, Brownlee Law Office PLLC, Hamilton, Montana

      For Respondent:

          Honorable Mike McGrath, Attorney General; Pamela P. Collins,
          Assistant Attorney General, Helena, Montana

          George Corn, County Attorney, Hamilton, Montana

                       Submitted on Briefs:  November 22, 2006

                       Decided:  February 13, 2007

Filed:

                           Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    Larry DeWayne Adams appeals from the Twenty-First Judicial District Court's denial of his amended petition for postconviction relief. We affirm.

¶2    Adams raises the following issues on appeal:

¶3    1. Did the District Court err in denying Adams' amended petition for postconviction relief alleging Adams received ineffective assistance of counsel when his attorneys failed to file a motion to dismiss for lack of speedy trial?

¶4    2. Did the District Court err in denying Adams' amended petition for postconviction relief alleging Adams received ineffective assistance of counsel when his attorney failed to object to a jury instruction on aggravated assault as a lesser included offense of the attempted deliberate homicide charge?

¶5    3. Did the District Court err in denying Adams' amended petition for postconviction relief alleging Adams received ineffective assistance of counsel when his attorney failed to move for a directed verdict regarding aggravated assault?

¶6    4. Did the District Court legally sentence Adams when it imposed a ten-year weapon enhancement?

## BACKGROUND

¶7    On October 2, 1998, the State charged Adams by information with attempted deliberate homicide, obscuring the identity of a machine, possession of a switchblade knife, criminal possession of dangerous drugs, and criminal possession of drug paraphernalia. The information included a notice that, pursuant to § 46-18-221, MCA

2

(1997), Adams could receive an enhanced sentence for the attempted deliberate homicide offense because he used a weapon in the commission of the offense.

¶8      Adams was tried by a jury on September 20 and 21, 1999. The jury found Adams guilty of aggravated assault, a lesser included offense of attempted deliberate homicide, not guilty of obscuring the identity of a machine, guilty of possession of a switchblade knife, guilty of criminal possession of dangerous drugs, and guilty of criminal possession of drug paraphernalia.

¶9      Adams' charges arose out of an altercation between Adams and his girlfriend, Jackie Wright, on September 14, 1998. Early that morning, Adams returned to the home he and Wright shared in Victor, Montana, after several hours of drinking at a nearby bar. Adams and Wright started to argue. Adams began throwing things, including loose change, boots, lamps, and a coffee table. He picked up a .9 millimeter pistol and started waving it around, then fired it into the wall a couple feet to Wright's left and a few inches above her head. He then knelt down in front of Wright, yelled at her, and put the gun to her chest. Wright looked Adams in the face, thinking he was going to kill her. She heard the gun click, then saw a look of surprise on Adams' face, as if he was shocked the gun did not fire.

¶10     After the gun failed to fire, Adams went down a hallway then came back without the gun. According to Wright, he then threw another lamp toward her. She picked up the lamp and tried to defend herself with it as Adams came at her. Adams grabbed Wright and started hitting her on the head and chest with his fists. They fell to the floor and Adams straddled her, grabbing her hair and hitting her head on the floor. Wright looked

3

up and saw Adams with the coffee table over his head as he brought it down on her. She put up her left arm to protect herself, but was hit on the head with the table. She felt herself losing consciousness and realized that she had wet herself. She came around when she felt warmth on her neck. Adams was walking down the hall again and Wright thought he was going to retrieve the gun. She got up and ran out of the house toward the neighbor's house. She got to the neighbor's door and saw Adams following her. She started slamming the screen door to try to wake up the neighbors. She then tried the door knob, found it was unlocked, and entered the house and locked the door behind her.

¶11 The neighbors in the house testified they woke up to the sound of Wright slamming the screen door. They found Wright in their living room. She was telling them to help her, her boyfriend was trying to kill her. The neighbors called the police and tried to calm Wright down. She refused to sit on their furniture because she had lost control of her bladder. The neighbors said she appeared to have been beaten and her ear was bleeding.

¶12 After law enforcement arrived and secured the area, Wright was transported to the hospital by ambulance. The emergency room doctor stitched up a tear in her ear and admitted her to the hospital overnight to observe her because of her head injury. The doctor diagnosed Wright as having a concussion, which meant that Wright had either been knocked unconscious or hit hard enough on the head to be dazed. Wright also had a laceration of her ear and multiple contusions and abrasions. The doctor testified Wright's injuries were consistent with being beaten by a fist and hit by the edge of a table. Wright testified that as a result of the incident, she had pain in her ribs that lasted for about six

4

months, and still bothered her when driving long distances. She also testified that the pain in her head from the concussion lasted for a month or two.

¶13 Adams testified on his own behalf at trial, asserting that the gun was sitting on the kitchen counter, already cocked. When he picked it up to unload it, Wright started to grab for it, and it went off and hit the wall. He said he then ejected the magazine and threw the gun and the magazine against the wall. He said Wright then started to swing at him, so he laid her on the floor and she pulled her earring out of her own ear. When he went to get her a washcloth from the bathroom down the hall, Wright ran out the door and down the driveway toward the neighbors' house. He ran after her because he did not want her to make a fool of herself in the little red and black, lacy, waist-length nighty he said she was wearing that night. He testified that when he saw her banging the neighbors' screen door against her own head, he gave up and went home and went to bed.

¶14 Law enforcement officers testified that when they searched the home later, they found the gun laying against a wall with the magazine still in it. They also testified that Wright was wearing a white nightshirt when they found her at the neighbors' house, and it was stained yellow on the bottom. At Adams' house, the officers found the coffee table upright in the middle of the living room with Adams' wallet lying on it. They saw several lamps had been broken. They also saw a bullet hole in the wall. They recovered a bullet casing in the living room and a fired .9 millimeter bullet in a hall closet.

¶15 Adams' defense counsel hired a ballistics expert that testified that the gun did not fire every time the trigger was pulled, and that it was not predictable when it would or would not fire. The expert testified that in order for Wright to hear a clicking sound

5

coming from the gun, one of two things would have happened: either the trigger was pulled and the hammer fell, causing a round to fire, or the trigger was pulled and the hammer fell, and the gun did not fire, but in that case, the round in the chamber would be marked. He said the round found in the chamber that night was not marked. He also stated, however, that when the trigger of that particular gun is pulled quickly, the hammer does not fall, and thus the round is not marked, but it can make a mechanical noise that might sound like a click.

¶16 On December 1, 1999, the District Court sentenced Adams to twenty years in the Montana State Prison for the aggravated assault conviction, five years for the criminal possession of dangerous drugs conviction, six months for the possession of a switchblade knife conviction, and six months for the possession of drug paraphernalia conviction, all to run consecutively. Pursuant to § 46-18-221, MCA (1997), the court sentenced Adams to an additional ten years in prison for using a dangerous weapon during the commission of the aggravated assault. Following sentencing, Adams' attorney withdrew as counsel and told Adams he needed to contact the public appellate defenders' office if he wanted to pursue an appeal.

¶17 On October 16, 2000, Adams, acting pro se, filed a petition for postconviction relief in the District Court. His petition alleged ineffective assistance of his original attorney to file a motion to dismiss for lack of a speedy trial. He also alleged ineffective assistance of his subsequently appointed trial attorney for offering a lesser included offense instruction on aggravated assault, and for failing to file an appeal to this Court following Adams' convictions. Finally, Adams' petition alleged that the District Court

6

imposed the sentence enhancement for use of a dangerous weapon in violation of his constitutional rights. The District Court denied Adams' petition for postconviction relief and Adams appealed to this Court. On September 5, 2002, in *State v. Adams*, 2002 MT 202, 311 Mont. 202, 54 P.3d 50, this Court reversed the District Court, finding that Adams was denied effective assistance of counsel when his trial attorney withdrew following trial and failed to file an appeal to this Court. We stated that Adams could file an amended petition for postconviction relief and raise: (1) those issues that could have been raised in direct appeal but for counsel's abandonment of his appeal; and (2) those issues properly raised in a petition for postconviction relief that have not already been raised. *Adams*, ¶ 22. Adams now raises the above issues on appeal.

## STANDARD OF REVIEW

¶18     The standard of review of a trial court's denial of a petition for postconviction relief is whether the court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *Hope v. State*, 2003 MT 191, ¶ 13, 316 Mont. 497, ¶ 13, 74 P.3d 1039, ¶ 13. A claim of ineffective assistance of counsel is reviewed *de novo*. *Hope*, ¶ 13.

¶19     It is a question of law whether a defendant has been denied the right to a speedy trial, and we review a district court's determination of a question of law for correctness. *State v. Keyes*, 2000 MT 337, ¶ 7, 303 Mont. 147, ¶ 7, 15 P.3d 443, ¶ 7.

¶20     This Court reviews jury instructions to determine whether the instructions as a whole fully and fairly instruct the jury on the law applicable to the case. *State v. Martin*, 2001 MT 83, ¶ 23, 305 Mont. 123, ¶ 23, 23 P.3d 216, ¶ 23. We give broad discretion to a

7

district court in formulating jury instructions. *State v. Beavers*, 1999 MT 260, ¶ 20, 296 Mont. 340, ¶ 20, 987 P.2d 371, ¶ 20.

¶21 We review a sentence for legality only. *State v. Garrymore*, 2006 MT 245, ¶ 9, 334 Mont. 1, ¶ 9, 145 P.3d 946, ¶ 9.

## DISCUSSION

¶22 Adams argues that he received ineffective assistance of counsel when his first and subsequent attorneys failed to file a motion to dismiss for lack of speedy trial, when his trial attorney failed to object to a jury instruction on aggravated assault as a lesser included offense of the attempted deliberate homicide charge, and when his trial attorney failed to move for a directed verdict regarding aggravated assault. To prove an ineffective assistance of counsel claim, the defendant must meet both prongs of the two-part test this Court adopted from *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Under the *Strickland* test, the defendant must show his counsel's performance was deficient and the deficient performance prejudiced him. *Hans v. State*, 283 Mont. 379, 391-92, 942 P.2d 674, 681-82 (1997). A defendant must satisfy both prongs of the test; if an insufficient showing is made regarding one prong, there is no need to address the other. *Dawson v. State,* 2000 MT 219, ¶ 21, 301 Mont. 135, ¶ 21, 10 P.3d 49, ¶ 21 (citing *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069).

¶23 The defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct," and that, "under the circumstances, the challenged action 'might be considered sound trial strategy.'" *State v. Jefferson*, 2003 MT 90, ¶ 48, 315 Mont. 146, ¶ 48, 69 P.3d 641, ¶ 48 (citing *Strickland*,

8

466 U.S. at 688-89, 104 S. Ct. at 2064-65). This Court will review the acts or omissions that the defendant alleges were outside the range of reasonable professional judgment, taking into consideration all the circumstances of the case. *Jefferson*, ¶ 48 (citing *Strickland*, 466 U.S. at 688, 690, 104 S. Ct. at 2065-66).

¶24 **ISSUE 1: Did the District Court err in denying Adams' amended petition for postconviction relief alleging Adams received ineffective assistance of counsel when his attorneys failed to file a motion to dismiss for lack of speedy trial?**

¶25 Adams was arrested on September 14, 1998. He was appointed an attorney, Donald Spadone, who filed a motion to continue the initial appearance set for October 14, 1998, to October 28, 1998, because Spadone planned to be out of town. Spadone hired a ballistics expert in November 1998. The parties were ordered to have a face-to-face settlement conference on January 7, 1999. The parties did not resolve the case at the face-to-face conference and requested another conference be set in thirty days. Another conference was scheduled for February 4, 1999. Spadone requested that this conference be moved back another month to March 4, 1999, because he was waiting for the report from the ballistics expert. The court granted this motion. Spadone again requested that the conference be moved to April 8, 1999, because the gun had been sent to the wrong address so the ballistics expert had not yet had a chance to examine it and write his report. The conference was held on this date, but the parties did not resolve the case. The court then set the trial to start on June 7, 1999.

¶26 On May 20, 1999, just days before trial was to start, Spadone filed a motion to withdraw as Adams' attorney. Spadone based his motion on the fact that Adams had

written a letter to the Ravalli County commissioners which accused Spadone of "wild and unsubstantiated charges as to [Spadone's] contact with the victim of the crime." The letter further alleged Adams had a case against Spadone for ineffective assistance of counsel and that Spadone had violated Adams' constitutional rights. Spadone stated that the defendant did not have confidence in Spadone's representation of him. The court held a hearing on the motion and subsequently ordered that Spadone be allowed to withdraw as Adams' counsel. The court advised Adams that a change in attorney would delay his trial. Adams agreed to waive his speedy trial rights in order to be appointed a new attorney. He objected to the court's appointment of another public defender. Nonetheless, the court appointed a public defender, David Stenerson, over Adams' objections. The trial was reset to start September 20, 1999, in order to give new counsel time to prepare. On August 5, 1999, Stenerson was relieved as Adams' counsel and Mark McLaverty was appointed instead because the county changed public defender contracts. McLaverty represented Adams at his trial starting on September 20, 1999.

¶27 Adams argues that his constitutional right to a speedy trial was violated by the delay between his arrest and his trial. He asserts that he asked Spadone to file a motion to dismiss based on lack of speedy trial, but no such motion was filed. He also argues that McLaverty should have filed a motion to dismiss on this basis as well. He argues that had a motion been filed, the outcome would have been different because his charges would have been dismissed. Adams must show that his counsel's failure to file such a motion fell below reasonable professional judgment, and that the failure prejudiced him.

10

¶28 A criminal defendant's right to a speedy trial is guaranteed by both the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution. *State v. Price*, 2001 MT 212, ¶ 11, 306 Mont. 381, ¶ 11, 34 P.3d 112, ¶ 11. The United States Supreme Court established four factors to consider when analyzing a claimed denial of speedy trial: length of delay, the reason for the delay, the defendant's timely assertion of his right to a speedy trial, and the prejudice to the defense caused by the delay. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972). This Court adopted these factors for analyzing such claims. *See City of Billings v. Bruce*, 1998 MT 186, ¶ 19, 290 Mont. 148, ¶ 19, 965 P.2d 866, ¶ 19.

### a. Length of Delay

¶29 The time between Adams' arrest and the beginning of the first trial date amounts to 267 days, and from his arrest to actual trial amounts to 372 days. A delay of 200 or more days triggers further speedy trial analysis. *Bruce*, ¶ 55. Both the 267-day delay and the 372-day delay render further speedy trial analysis necessary.

### b. Reason for Delay

¶30 This factor requires us to determine which party is responsible for specific periods of delay and allocate the total time of delay between the parties. *Price*, ¶ 14. If 275 or more days of delay are attributable to the State, the initial burden is on the State to show that the defendant suffered no prejudice from the delay. *Bruce*, ¶ 56. If fewer than 275 days are attributable to the State, the defendant retains the burden to demonstrate prejudice. *Bruce*, ¶ 56.

11

¶31 Adams requested continuances from February 4 to April 8, 1999, to move back the face-to-face conference so that he could have the benefit of the ballistics expert's report, causing a delay of 64 days. Institutional delays are those that are caused by overcrowded court dockets and other similar events, and are attributable to the State. *State v. Small*, 279 Mont. 113, 118-19, 926 P.2d 1376, 1379 (1996). In this case, there is no evidence the delay was caused by any conduct on the part of the State, nor was it institutional delay; therefore, the delay is attributable to the defendant. *State v. Mooney*, 248 Mont. 115, 119, 809 P.2d 591, 594 (1991) (*overruled in part on other grounds by Bruce*, 1998 MT 186, 290 Mont. 148, 965 P.2d 866).

¶32 The additional 105-day delay between the first trial setting and the second trial setting resulted from Spadone's motion to withdraw as counsel, which was prompted by Adams' accusations of ineffective assistance of counsel. This delay is attributable to Adams. *State v. Dess*, 184 Mont. 116, 119, 123-24, 602 P.2d 142, 144, 146 (1979) (delay caused by defendant's motion for continuance when public defender retired and asked for time for defendant's new attorney to get caught up on case attributed to defendant).

¶33 In total, of the 372 days of delay, at most, 203 days are attributable to the State, and 169 days are attributable to Adams. Since fewer than 275 days of the delay are attributable to the State, the burden is on Adams to demonstrate prejudice from the delay.

c. Assertion of Right

¶34 To satisfy this factor, the defendant must either demand a speedy trial or file a motion to dismiss for lack of a speedy trial prior to the commencement of trial. *Bruce*, ¶ 57. Adams asserts that he requested Spadone to file a motion to dismiss for denial of a

12

speedy trial in the spring of 1999, before the first trial setting. Although he states he made note of this in daily logs he kept in jail, he failed to produce such logs in any court proceedings. Adams also asserts that he requested McLaverty to file a motion to dismiss on the same basis. McLaverty testified that he and Adams had discussed speedy trial rights, but that Adams had already made a limited waiver of those rights so that McLaverty could prepare for trial. McLaverty testified that Adams did not ask him to file a motion to dismiss for lack of speedy trial. However, because this is an ineffective assistance of counsel claim, we will give Adams the benefit of the doubt and assume, arguendo, that he asked McLaverty to file a motion to dismiss for denial of speedy trial.

*d. Prejudice*

¶35    The speedy trial guarantee is designed to minimize delay and the prejudice resulting from pretrial incarceration, anxiety and concern, and impairment of defense. *Bruce*, ¶ 68. As we previously explained, the burden is on Adams to demonstrate prejudice from the delay.

¶36    In this case, Adams does not allege prejudice from pretrial incarceration except to the extent it impaired his ability to help defend himself. He states that he was prejudiced by the delay "because he was incarcerated for approximately nine months and was unable to effectively assist in his defense." At the hearing on this issue, Adams claimed had he not been in jail, he would have inspected the premises, reviewed the evidence, made phone calls, and interviewed witnesses. Adams does not demonstrate how his inability to do these things (all of which his attorneys did in preparation for trial) impaired his ability

13

to defend himself. Adams does not allege that the delay caused him anxiety or concern. Thus, Adams has not carried the burden of demonstrating prejudice.

¶37 Since Adams has failed to demonstrate any prejudice from the delay in his trial, he has failed to establish that the outcome of the proceedings would have been different had his attorneys filed a motion to dismiss as he requested. We affirm the District Court's conclusion that Adams was not denied effective assistance of counsel for his attorneys' failure to file a motion to dismiss for lack of speedy trial.

¶38 **ISSUE 2: Did the District Court err in denying Adams' amended petition for postconviction relief alleging Adams received ineffective assistance of counsel when his attorney failed to object to a jury instruction on aggravated assault as a lesser included offense of the attempted deliberate homicide charge?**

¶39 Adams was charged with attempted deliberate homicide. At the close of trial, the court instructed the jury on attempted deliberate homicide, as well as aggravated assault and felony assault as lesser included offenses. Adams alleges that McLaverty should have objected to the jury instruction that allowed the jury to consider aggravated assault as a lesser included offense. He states there was no basis for the jury to convict him for aggravated assault because he did not cause Wright serious bodily injury.

¶40 As provided in § 45-5-202, MCA, a person commits the offense of aggravated assault if the person purposely or knowingly causes serious bodily injury to another. Serious bodily injury is defined as bodily injury that:

> (i)  creates a substantial risk of death;
> (ii)  causes serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ; or

14

(iii) at the time of injury, can reasonably be expected to result in serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ.

Section 45-2-101, MCA.

¶41 Contrary to his assertions, the record contains evidence from which the jury could conclude that Adams inflicted serious bodily injury on Wright. The doctor, the neighbors, and law enforcement officers testified that Wright was injured, and that the tear in her ear left a scar. The jury heard testimony that Adams caused a concussion when he brought the table down on Wright's head, and that the pain from that lasted for a month or two. They also heard Wright testify that she continued to have occasional pain in her ribs.

¶42 McLaverty testified at the hearing on the amended petition that in discussing trial strategy with Adams, Adams' biggest concern was that he did not want to be convicted of attempted deliberate homicide. To that end, McLaverty did not object to any lesser included offenses. Part of the defense strategy in closing was to argue that, if anything, Adams' conduct constituted felony assault with a weapon. The jury was instructed it could consider either of these lesser included offenses.

¶43 A criminal defendant is entitled to jury instructions that cover an issue or theory if there is evidence to support such an instruction. *Beavers*, ¶ 23. It is fundamental under Montana law that "a defendant is entitled to a jury instruction on a lesser included offense when one of the parties requests it and the record contains evidence from which the jury could rationally find the defendant guilty of the lesser offense and acquit of the greater." *Beavers*, ¶ 23. An attorney's failure to object does not constitute ineffective assistance of

15

counsel if the objection lacked merit and would have been properly overruled. *State v. Hildreth*, 267 Mont. 423, 432-33, 884 P.2d 771, 777 (1994) (citing *State v. Rodgers*, 257 Mont. 413, 421, 849 P.2d 1028, 1033 (1993)). An objection to the introduction of the jury instruction on aggravated assault would not have been properly sustained in this case because the record contained evidence from which the jury could rationally find the defendant guilty of aggravated assault and acquit of attempted deliberate homicide.

¶44 We affirm the District Court's conclusion that Adams was not denied effective assistance of counsel for his attorney's failure to object to a jury instruction on aggravated assault.

¶45 **ISSUE 3: Did the District Court err in denying Adams' amended petition for postconviction relief alleging Adams received ineffective assistance of counsel when his attorney failed to move for a directed verdict regarding aggravated assault?**

¶46 Adams argues that he received ineffective assistance of counsel because McLaverty failed to move for a directed verdict at the close of evidence on the aggravated assault charge because there was no evidence to support a finding of serious bodily injury. A district court will grant a motion for a directed verdict "only when there is a complete absence of any evidence which would justify submitting an issue to a jury." *State v. Smith*, 2005 MT 325, ¶ 25, 329 Mont. 526, ¶ 25, 127 P.3d 353, ¶ 25. When the evidence provided by the parties conflicts, "the court should not invade the province of the jury by directing a verdict." *Smith*, ¶ 25. Given that Adams and the State provided conflicting evidence on the issue of serious bodily injury, a directed verdict would not have been granted.

16

¶47 We affirm the District Court's conclusion that Adams was not denied effective assistance of counsel for his attorney's failure to move for a directed verdict.

¶48 **ISSUE 4: Did the District Court legally sentence Adams when it imposed a ten-year weapon enhancement?**

¶49 Adams provides two arguments to support his contention that the court imposed an illegal sentence when it sentenced him to an additional ten years in prison pursuant to § 46-18-221, MCA (1997). First, he asserts there was not enough evidence to support a finding that a weapon was used in the commission of the aggravated assault, and secondly, that the enhanced sentence violated his right to due process of law.

¶50 The weapons enhancement statute in effect at the time of the offense and Adams' sentencing provided:

> A person who has been found guilty of any offense and who, while engaged in the commission of the offense, knowingly displayed, brandished, or otherwise used a firearm, destructive device, as defined in 45-8-332(1), or other dangerous weapon shall, in addition to the punishment provided for the commission of such offense, be sentenced to a term of imprisonment in the state prison of not less than 2 years or more than 10 years except as provided in 46-18-222.

Section 46-18-221, MCA (1997). A weapon is defined as "an instrument, article, or substance that, regardless of its primary function, is readily capable of being used to produce death or serious bodily injury." Section 45-2-101, MCA.

¶51 In his first argument, Adams contends that the evidence does not support a conclusion that he used the table as a weapon since he demonstrated that he could not lift the table over his head as alleged by Wright. Adams overlooks the fact that the weapons enhancement can be based on the *display*, *brandishment*, or *use* of a firearm or weapon.

17

He also overlooks the fact that, in addition to the testimony that he used a coffee table to hit Wright in the head, there was testimony that he brandished and pointed a .9 millimeter pistol at Wright's chest. The record clearly supports the conclusion that Adams used or displayed a weapon in the commission of the offense.

¶52 In his second argument, Adams relies on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), to support his contention that he was denied his right to due process, as provided by the United States and Montana Constitutions, when the court enhanced his sentence without a finding by the jury that he had used a weapon. The United States Supreme Court, in *Apprendi*, held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63.

¶53 In 2001, in accordance with the *Apprendi* decision, the Montana Legislature amended § 46-18-221, MCA, so that in order to enhance a sentence for an offense committed with a dangerous weapon, the provisions of § 46-1-401, MCA, must be complied with. With regard to jury trials, § 46-1-401, MCA, now requires that the jury unanimously make a separate finding that the enhancing act (i.e., the use of a weapon) occurred beyond a reasonable doubt.

¶54 Adams argues that the 1997 version of § 46-1-401, MCA, which applied to him and did not require a separate finding, was unconstitutional. He contends that the fact the legislature amended the statute in 2001 "show[s] an acknowledgement that there was a

18

significant issue with the previous Statute." In essence, Adams argues that *Apprendi* be applied retroactively.

¶55 In response, the State argues that Adams failed to preserve this issue on appeal and it should be dismissed pursuant to *State v. Courville*, 2002 MT 330, 313 Mont. 218, 61 P.3d 749 (citations omitted). In *Courville*, we relied on the general rule that "issues not raised before the trial court and new legal theories are not considered by this Court on appeal because it is unfair to fault the trial court on an issue it was never given an opportunity to consider." *Courville*, ¶ 5. However, the issue presented here is similar to the issue in our recent *Garrymore* decision. *Garrymore*, ¶ 3. In *Garrymore*, the defendant did not object at sentencing when the court imposed a parole eligibility restriction pursuant to statute, but then later relied on *Apprendi* and argued on appeal that this parole restriction violated his statutory and constitutional due process rights. *Garrymore*, ¶¶ 7-8. The State asserted that Garrymore's failure to object at sentencing precluded him from raising the issue on direct appeal. *Garrymore*, ¶ 10. We determined that this was the type of illegal sentence issue that falls under the *Lenihan* exception. *Garrymore*, ¶ 5. In *Lenihan*, we stated: "It appears to be the better rule to allow an appellate court to review any sentence imposed in a criminal case, if it is alleged that such sentence is illegal or exceeds statutory mandates, even if no objection is made at the time of sentencing." *Garrymore*, ¶ 11 (quoting *State v. Lenihan*, 184 Mont. 338, 343, 602 P.2d 997, 1000 (1979)). Since Adams could have raised this issue on direct appeal, and since we remanded allowing him to address any issues he could have raised on direct appeal, we will undertake appellate review of the sentencing issue raised herein.

¶56 Because the events giving rise to the charges and Adams' conviction occurred before the *Apprendi* decision was made, we must determine if *Apprendi* applies retroactively. In *Gratzer v. Mahoney*, 2006 MT 282, ¶ 11, 334 Mont. 297, ¶ 11, __ P.3d __, ¶ 11, this Court held that *Apprendi* does not apply retroactively to cases on collateral review. However, we have never determined whether *Apprendi* applies retroactively to cases on direct appeal. This Court has adopted the United States Supreme Court's conclusion that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *State v. Egelhoff*, 272 Mont. 114, 125, 900 P.2d 260, 267 (1995) (*overruled on other grounds by Montana v. Egelhoff*, 518 U.S. 37, 116 S. Ct. 2013 (1996)) (quoting *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 716 (1987)); *see also State v. Waters*, 1999 MT 229, ¶ 21, 296 Mont. 101, ¶ 21, 987 P.2d 1142, ¶ 21. A new rule is one which "breaks new ground or imposes a new obligation on the States or the Federal Government." *Egelhoff*, 272 Mont. at 126, 900 P.2d at 267 (citing *Teague v. Lane*, 489 U.S. 288, 301, 109 S. Ct. 1060, 1070 (1989)). The rule stated in *Apprendi* is one which imposed a new obligation on the State, and therefore is a new rule which applies retroactively to cases pending on direct review or not final at the time the new decision was issued.

¶57 As stated, Adams argues his sentence was unconstitutional because the statute he was sentenced under does not follow the procedures required under *Apprendi*. Although the State gave notice in the information that his sentence could be enhanced for use of a weapon, that issue was not submitted to the jury, and thus, the jury did not make a

20

unanimous finding of use of a weapon beyond a reasonable doubt. This, Adams contends, constitutes error under *Apprendi*.

¶58 The State argues that any error here was harmless because the finding that Adams displayed, brandished, or used a firearm or other dangerous weapon was implicit in the jury's verdict finding Adams guilty of aggravated assault. We agree with the State that *Apprendi* error is subject to harmless error review, and although we find the error here harmless, we reject the State's contention that Adams' use of a weapon was implicit in the jury's verdict of aggravated assault. Our conclusion is based on the following analysis.

¶59 A defendant's right to a jury trial is guaranteed by the Sixth Amendment of the United States Constitution. The Due Process Clause of the Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970). In the case of *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 1833 (1999), the trial court failed to instruct the jury to make a finding of materiality, an element of the fraud crimes with which the defendant was charged. The United States Supreme Court determined that the failure to submit an element of a crime to a jury as required by the Constitution does not rise to the level of structural error which would require automatic reversal. *Neder*, 527 U.S. at 8-9, 119 S. Ct. at 1833-34. Thus, failure to submit an element of a crime to a jury is subject to the harmless error test. *Neder*, 527 U.S. at 15, 119 S. Ct. at 1837. The test for determining whether such a constitutional error is harmless is "whether it appears 'beyond a reasonable doubt that the

21

error complained of did not contribute to the verdict obtained.'" *Neder*, 527 U.S. at 15, 119 S. Ct. at 1837 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967)). After applying the harmless error test, the Court stated:

> In this situation, where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.

*Neder*, 527 U.S. at 17, 119 S. Ct. at 1837. Since Neder did not and could not bring forth facts contesting the omitted element, the result would have been the same had the court instructed the jury to make a finding of materiality. *Neder*, 527 U.S. at 19, 119 S. Ct. at 1838. The United States Supreme Court instructed reviewing courts that in cases such as this one, the reviewing court must examine the record to determine if the result would have been the same absent the error; if the reviewing court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same, it cannot conclude that harmless error occurred. *Neder*, 527 U.S. at 19, 119 S. Ct. at 1838. The error will not be harmless if the record shows that the defendant contested the omitted element and raised sufficient evidence to support a contrary finding. *Neder*, 527 U.S. at 19, 119 S. Ct. at 1838.

¶60 After *Neder* was decided, the United States Supreme Court decided *Apprendi*. The issue in *Apprendi* was whether a defendant's sentence could be enhanced beyond the statutory maximum based on a fact found by the sentencing judge, rather than the jury which determined the verdict. *Apprendi*, 530 U.S. at 469, 120 S. Ct. at 2351. The Court stated that sentencing factors, like elements to a crime, implicate a defendant's due

process rights because liberty is at stake. *Apprendi*, 530 U.S. at 476-78, 120 S. Ct. at 2355-56. Thus, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63.

¶61 The standard of review applicable to *Apprendi* error was not addressed until the recent decision of *Washington v. Recuenco*, __ U.S. __, 126 S. Ct. 2546 (2006). The alleged error in *Recuenco* was that the trial court subjected the defendant to a *firearm* enhancement at sentencing based only on the jury's finding that he was armed with a "deadly weapon," which the State of Washington conceded was an error under *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). *Recuenco*, ___ U.S. at ___, 126 S. Ct. at 2549. *Blakely* error, like *Apprendi* error, occurs when the judge enhances a sentence beyond the statutory maximum based on aggravating facts not found by a jury or admitted by the defendant. *Blakely*, 542 U.S. at 303-04, 124 S. Ct. at 2537-38; *Cunningham v. California*, 2007 WL 135687, *11 (U.S. Jan. 22, 2007). The State of Washington argued *Blakely* error was harmless error, but the Washington Supreme Court determined that this type of error was structural error which will always invalidate the conviction. *Recuenco*, ___ U.S. at ___, 126 S. Ct. at 2550. The United States Supreme Court reversed the Washington Supreme Court, relying on the *Neder* holding that harmless error analysis applies to errors where the trial court failed to submit an element of an offense to a jury. *Recuenco*, __ U.S. at __, 126 S. Ct. at 2552. The Supreme Court stated that "an instruction that omits an element of an offense does not *necessarily* render

23

a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Recuenco*, __ U.S. at __, 126 S. Ct. at 2551 (quoting *Neder*, 527 U.S. at 9, 119 S. Ct. at 1833). Taking the analysis one step further, the United States Supreme Court noted its recognition in *Apprendi* "that elements and sentencing factors must be treated the same for Sixth Amendment purposes," and thus, it held that "[f]ailure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error." *Recuenco*, __ U.S. at __, 126 S. Ct. at 2552-53. The case was remanded for a harmless error analysis. *Recuenco*, __ U.S. at __, 126 S. Ct. at 2553.

¶62     Following *Recuenco*, the Ninth Circuit Court of Appeals applied the harmless error test formulated in *Neder* in a case alleging *Apprendi* error. *United States v. Zepeda-Martinez*, 470 F.3d 909, 910 (9th Cir. 2006). The appropriate harmless error test is whether the "court finds beyond a reasonable doubt that the result 'would have been the same absent the error.'" *Zepeda-Martinez*, 470 F.3d at 913 (quoting *Neder*, 527 U.S. at 19, 119 S. Ct. at 1838). The error is harmless if the record contains overwhelming and uncontroverted evidence supporting the sentencing factor. *Zepeda-Martinez*, 470 F.3d at 913. The error is not harmless if "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding." *Zepeda-Martinez*, 470 F.3d at 913 (quoting *Neder*, 527 U.S. at 19, 119 S. Ct. at 1838).

¶63     Thus, the inquiry in this case is whether, beyond a reasonable doubt, Adams would have received an enhanced sentence based on the display or use of a weapon had the question been presented to the jury. The evidence presented at trial was that Adams used a coffee table and a gun as weapons. The doctor presented evidence that Wright's

injuries were consistent with being hit by a coffee table. She had bruising on her arm consistent with trying to protect herself from a blow, and a tear in her ear that could have been caused by the edge of a coffee table. Adams contested his alleged use of the coffee table by demonstrating that he could not pick it up. However, in his appeal brief on the "weapon" issue, he does not contest that a gun was used. He fails to mention the gun at all. Further, during closing argument, Adams actually argued that this assault, if anything, amounted to felony assault with a weapon, thus acknowledging the use of a weapon. The evidence that Adams used a gun while committing aggravated assault is uncontroverted. Having reviewed the record, we conclude that the result would have been the same. That is, Adams would have received an enhanced sentence based on use of a weapon had the jury been asked to make a finding on that issue. Thus, the error in this case is harmless.

¶64    A defendant's right to a jury trial is also guaranteed by Article II, Section 26 of the Montana Constitution. This Court has adopted its own two-step analysis to determine whether an alleged error prejudiced a defendant's right to a fair trial and is therefore reversible. *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, ¶ 37, 32 P.3d 735, ¶ 37. We must first determine whether the claimed error is structural error or trial error. *Van Kirk*, ¶ 37. "'Structural' error is that type of error that '[a]ffects the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" *Van Kirk*, ¶ 38 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265, (1991)). Following the United States Supreme Court's ruling in *Recuenco*, __ U.S. at __, 126 S. Ct. at 2552-53, failure to submit a sentencing factor to the jury is not structural

25

error. Thus, in this case, the trial court's failure to submit the sentencing factor (Adams' use of a weapon) to the jury was trial error. *Van Kirk*, ¶ 40 (trial error is "that type of error that typically occurs during the presentation of a case to the jury"). Trial error is subject to review under our harmless error statute, § 46-20-701, MCA. *Van Kirk*, ¶ 40. A cause may not be reversed unless the record shows the error is prejudicial. Section 46-20-701, MCA.

¶65 Because the error is trial error, we proceed to our second step—determining whether the error was harmless under the circumstances. *Van Kirk*, ¶ 41. In determining whether it was harmless error for a court to enhance a defendant's sentence on facts not specifically found by a jury, we adopt the United States Supreme Court's analysis set forth above. We must determine whether Adams would have received an enhanced sentence based on the display or use of a weapon had the question been presented to the jury. Because the evidence that Adams used a gun while committing aggravated assault is uncontroverted, we conclude that the result would be the same; that Adams would have received an enhanced sentence based on use of a weapon had the jury been asked to make a finding on that issue. The error in this case is harmless.

¶66 We affirm the District Court.

/S/ W. WILLIAM LEAPHART

26

We concur:


/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ BRIAN MORRIS